# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

*In the Matter of the Search of* (Name, address or brief description of person, property, or premises to be searched)

MINGEI INTERNATIONAL INC., which operates the MINGEI INTERNATIONAL MUSEUM
1439 El Prado
San Diego, CA 92101

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

**CASE NUMBER:**

**'08 MJ 0205**

I _____Bonny L. MacKenzie_____ being duly sworn depose and say:

I am a _____Special Agent with the Internal Revenue Service_____ and have reason to believe
Official Title
that on the property or premises known as

See Attachments "A" & "C"

in the Southern District of California, there is now concealed property, namely

See Attachment "B"

which is

*Evidence of: a crime; contraband, fruits of crime, or other, items illegally possessed; and property assigned
for use, intended for use, or used in committing a crime;*

concerning violations of California Penal Code, Section(s) *31, 497*, Title __16__ United States Code,
Section(s) *470ee(c), (d)* and Title __18__ United States Code, Section(s) *371* and Title __26__ United States
Code Section(s) *7206(2)*. *The facts to support a finding of Probable Cause are as follows:*

See Attached Affidavit of IRS Special Agent Bonny L. MacKenzie.

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

_____NITA L. Stormes_____  at  _____San Diego, California_____   Date/Time issued

**Honorable**
**United States Magistrate Judge**
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

<u>AFFIDAVIT</u>

I, Bonny MacKenzie, being first duly sworn, do depose and state:

**I. INTRODUCTION**

1. I am a Special Agent ("SA") with the Internal Revenue Service ("IRS"), Criminal Investigation, and have been so employed since August of 2000. I have received training in accounting and financial investigative techniques at the Federal Law Enforcement Training Center in Glynco, Georgia. I have participated in the execution of numerous search warrants and consent searches involving tax and fraud offenses. I have participated in numerous investigations of criminal offenses, including tax crimes, money laundering, and other fraud-related offenses. Prior to becoming a SA, I was a Revenue Agent with the IRS for five years. As a Revenue Agent, I received extensive training in tax law, which I applied to the audits and determinations of tax exempt organizations. I continue to use and apply this knowledge in my current position as a SA. I also maintain an active Certified Public Accountant's license in the State of California. I have a Bachelor of Science degree in business administration, with emphases in accounting and finance.

2. I am currently involved in an ongoing criminal investigation that began in approximately April 2003 of a non-profit institution named MINGEI INTERNATIONAL INC., which

1

operates a museum, MINGEI INTERNATIONAL MUSEUM ("the MINGEI"),

located at 1439 El Prado in San Diego, California 92101.

3. During this investigation the MINGEI has been identified

as a repository for stolen Thai archaeological resources.

4. As a result of my investigation, I have probable cause to

believe that:

(a) the MINGEI received archaeological resources that

were stolen from Thailand in violation of California Penal Code

sections 31, 497, thus, in contravention of the Archaeological

Resources Protection Act, 16 U.S.C. sections 470ee(c),(d)

("ARPA"); and

(b) the acceptance by the MINGEI's staff of the

antiquities donated by the undercover agent ("UCA") enabled

others to conspire to aid and assist others in the preparation of

false tax returns in violation of 18 U.S.C. section 371 and 26

U.S.C. section 7206(2).

5. This affidavit is made in support of an application for a

search warrant commanding any agent of the IRS, Criminal

Investigation, the National Park Service, or Immigration and

Customs Enforcement with any appropriate investigative and

technical assistance they seek from other law enforcement

agencies, to search the MINGEI, including exhibition galleries,

offices, and curatorial facilities and the computers at that

institution ("the premises"), further described in Attachment A

2

to this application, for the items described in Attachment B to this application.

## II. STATUTORY OVERVIEW

### Archaeological Resources Protection Act (16 U.S.C. § 470)

6. Section 470bb(1) of ARPA defines "archaeological resources" as any material remains of past human life or activities which are at least 100 years of age, and which are of archaeological interest. The definition of "material remains" includes, but is not limited to, the following types of artifacts: whole or fragmentary tools, implements, containers, weapons, clothing, ornaments, pottery, and human remains. The regulations listing all of the types of "material remains" are found at 43 C.F.R. Part 7.

7. Subsection (c) of ARPA states no person may sell, purchase, exchange, transport, receive in interstate or foreign commerce, any archaeological resource removed, sold, purchased, exchanged, transported or received in violation of any provision of State law. (16 U.S.C. § 470ee(c)).

(a) California Penal Code section 497 makes it a violation of State law to receive property stolen in another country and to bring it into California knowing the property was stolen.

(b) California Penal Code section 31 states all persons concerned in the commission of a crime who have advised and

3

encouraged its commission or aid and abet in its commission are principals in any crime so committed.

(c) Section 24 of Thailand's Act on Ancient Monuments, Antiques, Objects of Art and National Museums, B.E. 2504 (1961/1992) ("The Thai Act") states that antiques that are buried, concealed or abandoned are state property. This provision was in the 1961 Thai Act and was renumbered in the 1992 Act.

(d) Section 4 of the Thai Act defines "antique" as an archaic movable property, whether produced by man or by nature, or being any part of an ancient monument or human skeleton or animal carcass which, by its age or characteristics of production or historical evidence, is useful in the field of art, history or archaeology. This provision was in the 1961 Thai Act and was renumbered in the 1992 Act.

(e) Section 21 of the Thai Act provides that no person shall export or take out of the Kingdom of Thailand any antique or object of art irrespective of whether it is registered or not, unless a license has been obtained. This restriction has been in effect since the Thai Act was enacted in 1961.

(f) On or about February 22, 2006, the Director General of the Fine Arts Department of the Thai government stated that as far as he knew, the Department has never given permission to anyone to take excavated antiquities out of Thailand for private

4

sale.  The Thai Fine Arts Department is the Thai government agency that is responsible for administering the Thai Act.

8. Subsection (d) of ARPA prohibits any person from knowingly counseling, procuring, soliciting, or employing any other person to violate any criminal section of ARPA.

## Conspiracy to Aid and Assist in the Preparation of False Tax Returns (18 U.S.C. § 371 and 26 U.S.C. § 7206(2))

9. These statutes provide in relevant part:

> Any person who ... willfully aids or assists in,
> or procures, counsels, or advises the preparation
> or presentation under, or in connection with any
> matter arising under, the internal revenue laws,
> of a return, affidavit, claim, or other document,
> which is fraudulent or is false as to any material
> matter, whether or not such falsity or fraud is
> with the knowledge or consent of the person
> authorized or required to present such return,
> affidavit, claim, or document ...

or conspires with others to do so is in violation 18 U.S.C section 371, 26 U.S.C. section 7206(2).

## Charitable Deductions for Donations to Museums

(a) I spoke to IRS Revenue Agent Gabourie Langer ("RA Langer"), who has been a revenue agent for more than 15 years, regarding a taxpayer deducting a contribution of an antiquity to a museum with the intended purpose not being for resale.  RA Langer told me:

(1) an individual taxpayer can take a charitable deduction on their individual income tax return for property they own and donate to a qualified institution;

5

(2) in order for the taxpayer to take the fair market value of the donated property, instead of the actual basis or the cost of the item, the taxpayer must have held the property for more than one year;

(3) the IRS defines fair market value as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts;

(4) an individual taxpayer who claims a charitable deduction for a donation of property valued between $501 to $5,000 must complete a Form 8283, Noncash Charitable Contributions, and attach it to their tax return;

(5) an individual taxpayer who claims a charitable deduction for gifts of property with a total claimed value of more than $5,000 must complete a Form 8283 and obtain a qualified appraisal for each item of property. The appraisal must be attached to the donor's tax return. If the appraised value exceeds $20,000, photographs of the appraised property must be included in the appraisal; and

(6) in general, for all contributions, no deduction is allowed for any contribution of $250 or more unless the taxpayer has a contemporaneous written acknowledgment of the contribution from the organization receiving the donation.

6

10. I reviewed the IRS Integrated Data Retrieval System database and determined the MINGEI INTERNATIONAL INC. is an institution qualified to receive charitable donations. Having been an IRS Exempt Organization Revenue Agent, I know that public charities are required to keep records of the contributions received and their contributors for 60 months.

## III. OVERVIEW OF THE UNDERCOVER INVESTIGATION OF THE MINGEI

11. The facts set forth below are based on my review of Immigration and Customs Enforcement ("ICE") and National Park Service ("NPS") reports of the investigation, recorded meetings and telephone conversations and letters and emails between the NPS undercover agent and MINGEI staff, photographs, statements by experts, Internet sites and IRS resources.

12. Targets of an investigation Bob Olson ("the smuggler") and Jon Markell ("the gallery owner") who were selling stolen Thai archaeological resources to an undercover NPS Special Agent ("UCA"), arranged for the UCA to donate Thai antiquities to the MINGEI in June 2006. Thereafter, the UCA participated in an undercover investigation of the MINGEI during which the MINGEI'S staff has:

(a) received stolen Thai archaeological resources that would enable the UCA to claim fraudulent charitable tax deductions; and

7

(b) possessed stolen archaeological resources from Thailand.

13. Between about June 23, 2006, to the present, the MINGEI staff and the UCA met on one occasion that was recorded by the UCA, exchanged about six recorded telephone calls, traded approximately 11 emails, and exchanged about nine letters regarding the museum's acceptance of archaeological resources that had been stolen from Thailand. The UCA donated stolen archaeological resources to the MINGEI on five occasions.

14. An expert in Southeast Asian antiquities reviewed photographs and/or the archaeological resources donated by the UCA to the MINGEI and opined that the vast majority of the items were authentic and over 100 years old. One of the experts also determined that the donated items fit within the ARPA definition of "archeological resources."

15. The MINGEI possesses material from Thailand that the staff refers to verbally and in writing as "Ban Chiang." Based on research I have done, I know the Ban Chiang culture lived in Northeast Thailand from roughly 1,000 B.C. until about A.D. 200. The original location where the Ban Chiang culture was discovered was named a World Heritage Site in 1992 and is considered the most important prehistoric settlement yet discovered in Southeast Asia. The surrounding area in Northeast Thailand also contains archaeological resources from the Ban Chiang culture, and it is

8

from this area that I believe the items possessed by the MINGEI
were obtained.

16.  From reviewing internet sites regarding Thai
antiquities, I have learned that the first Ban Chiang antiquities
were discovered, near the village of Ban Chiang, Thailand, in
1957, and that the sites were formally excavated beginning in
1967.  The smuggler has told the UCA that he has been in the
business of importing Ban Chiang and other Thai antiquities since
approximately 1980, and in 2003, he told the UCA that everything
that he had at that time had been imported within the past four
years.  The smuggler also told the UCA that he has never received
a permit for any of his Thai antiquities, and recently told the
UCA that he was getting items as they were being dug up.
Because the Thai Act was enacted in 1961, several years before
the antiquities were first excavated, I believe that any Ban
Chiang antiquities that have been exported from Thailand and
imported into the United States after the enactment of ARPA in
1979 were brought into this country in violation of that act.

17. The UCA has participated in more than 30 archaeological
theft investigations and has attended nearly 500 hours of
training specific to archaeology and the protection of cultural
resources. Based upon his experience and training, he believes
the Thai antiquities donated to, and possessed by, the MINGEI
fall within the ARPA categories of "archaeological resources."

9

## IV. STATEMENT OF PROBABLE CAUSE

## A. MUSEUM DONATIONS AND FALSE CHARITABLE TAX DEDUCTIONS

18. During a meeting between the gallery owner and the UCA
on or about October 14, 2004, the gallery owner stated:

(a) he made donations of Ban Chiang material to several
different museums;

(b) these donations were valued at less than $5,000 so
that an appraisal to support the tax deduction was not required;

(c) he brought a number of old stone adzes (axe heads)
back from Thailand;

(d) the adzes were 7-10,000 years old and each worth
about $150, but could each be donated to certain museums at an
appraised value of $1,000 or higher.

19. During a meeting on or about July 28, 2005 between the
gallery owner and the UCA, the gallery owner:

(a) asked the UCA if he needed tax deductions; and

(b) told the UCA that he had donated archaeological
resources to museums and had helped clients of his donate
antiquities purchased from him to museums.

20. In early 2006, the UCA expressed interest in having the
gallery owner assist him in donating Ban Chiang archaeological
resources to museums for charitable tax deductions.  The gallery
owner told the UCA that he normally charged $1,500 for a donation
that would be appraised at just under $5,000.  This price

10

included the purchase of the antiquities and the appraisal from the gallery owner. The UCA told the gallery owner that he was making quarterly estimated tax payments, and the gallery owner agreed to arrange quarterly donations.

21. In mid-June 2006, the gallery owner traded several emails with the Director of the MINGEI, Rob Sidner. These emails were forwarded by the gallery owner to the UCA. The purpose of these emails was for the gallery owner to offer Ban Chiang antiquities to the MINGEI on behalf of the UCA.

22. In an email on or about June 18, 2006, Sidner asked the gallery owner if there was any provenance problem with the archaeological resources being offered for donation.

23. The gallery owner replied in an email to Sidner on June 18, 2006 stating: none of the pieces have provenance problems, since they all came from my collection. I have been selling him [the UCA] pieces for the last few years, and mine were bought from the late Ben Johnson around 1983-85. Ben worked at LACMA [Los Angeles County Museum of Art] Conservation Department and all his pieces were kosher. Also, this was before the law was passed in Thailand forbidding the exportation of early ceramics without the permission of the Thai Fine Arts Department.

24. On several different occasions during the investigation, the gallery owner told the UCA that he regularly used the story about his Ban Chiang material coming from the deceased LACMA

11

curator when in fact the material did not come from the curator.
The gallery owner explained to the UCA that it effectively made
the antiquities untraceable.

25. During the investigation I have learned that the gallery
owner illegally imports Ban Chiang archaeological resources into
the United States and also obtains Ban Chiang antiquities from
the smuggler, whom the gallery owner has described to the UCA as
a grave robber.

26. On or about June 23, 2006, the UCA met with the gallery
owner.  At this meeting the UCA was given five Ban Chiang ceramic
vessels from Thailand and two other ceramic vessels that the
gallery owner had previously arranged for the MINGEI to accept as
a second quarter donation. The UCA and the gallery owner then
packaged the archaeological resources for shipping to the museum.
The UCA paid $1,500 cash to the gallery owner for the antiquities
and appraisal that had a value of $4,985.  This document was
supposedly prepared and signed by an independent appraiser, but
in fact was written and electronically signed with another
appraiser's name by the gallery owner.  The UCA shipped the
archaeological resources to Director Sidner at the MINGEI later
that day.

27. On or about October 11, 2006, the UCA met with Director
Sidner and Registrar Terri Bryson at the MINGEI. The following
occurred:

(a) Sidner gave the UCA a tour of the museum, exhibition galleries, offices, library, curatorial facility and the curatorial offices;

(b) Sidner showed the UCA the archaeological resources the UCA had previously donated that were stored in the curatorial facility;

(e) the UCA saw what appeared to be eight Ban Chiang antiquities labeled as having been donated in 2002.  Sidner told the UCA the gallery owner had made these available to the museum;

(f) Sidner told the UCA the museum was expecting to receive a million dollar donation from a collector of Indian material shortly and that the museum's collection was improving and growing all the time due to donations;

(g) the museum's curatorial staff showed the UCA their computer database that stores information on all objects in the museum's collection;

(h) Sidner told the UCA that Bryson was responsible for all documentation, shipping and receiving of items coming to the museum; and

(i) the UCA handed the director and curatorial staff copies of the Thai antiquity law and the appraisal for the first donation the UCA made to the museum in June of 2006.

28. On or about October 13, 2006, the UCA sent a letter to Registrar Bryson confirming that he had given a copy of the Thai

antiquities law to Director Sidner and the curatorial staff on his recent visit to the museum. The UCA also informed Bryson that the other Ban Chiang material the museum had in their collection came from the same source as the UCA's material.

29. The UCA made another donation of Ban Chiang archaeological resources to the MINGEI in the third quarter of 2006. This donation consisted of a Ban Chiang water buffalo vessel that the smuggler said had been recently brought into the United States by the smuggler. The vessel had been selected by the gallery owner from the smuggler's inventory. The UCA paid the smuggler $1,000 cash for the vessel and told the gallery owner this. Thereafter, the vessel was appraised by the gallery owner at $4,900. The UCA paid the gallery owner $350 cash for the appraisal. This document was supposedly prepared and signed by an independent appraiser, but in fact was written and electronically signed with another appraiser's name by the gallery owner. The gallery owner then shipped the ceramic vessel directly to the museum and sent the UCA pictures of what he had donated.

30. On or about March 12, 2007, the UCA mailed a copy of the appraisal for the third quarter 2006 donation, which consisted of the water buffalo vessel, along with a letter to Sidner. The letter stated:

> In the October 13th letter I also explained how I
> acquired the vessel from the same source [the smuggler]

14

as the Ban Chiang items you had previously received [a
curator of another museum] and [the gallery owner].
This importer regularly receives new material, some of
which is pretty spectacular and of museum quality (like
the water buffalo vessel).

31.  The smuggler told the UCA that he had people dig up
antiquities in Thailand for him.  The smuggler showed the UCA
photographs of dig sites in Thailand.

32. Throughout the undercover investigation, the smuggler
has maintained that it is illegal to export antiquities out of
Thailand, but it is not illegal to import them into the United
States.  However, the smuggler told Customs agents that only the
King of Thailand and the Thai government were permitted to own
Thai archaeological resources.

33.  In late March 2007, the gallery owner sent a collection
of Ban Chiang archaeological resources to the MINGEI on behalf of
the UCA.  The donation materials included stone and bronze adzes,
bracelets, beads, pottery anvils, spindle whorls and rollers. The
UCA paid $1,500 cash to the gallery owner for the first quarter
2007 donated items, which were appraised at $4,915 by the gallery
owner.

34. On or about June 20, 2007, the UCA mailed a copy of the
appraisal for the first quarter 2007 donation to Director Sidner
at the museum. Like the other appraisals, this document was
supposedly prepared and signed by an independent appraiser, but
in fact was written and electronically signed by the gallery

owner with another appraiser's signature. The UCA included a letter with the appraisal stating that even though the appraisal was signed by another person, the gallery owner had written the appraisal. Subsequently the UCA received confirmation emails from both Director Sidner and Registrar Bryson that they had received the appraisal and the UCA's letter.

35. In late September 2007, the gallery owner sent a large Ban Chiang ceramic vessel to the MINGEI on behalf of the UCA. The UCA had previously paid the gallery owner $1,500 cash toward the purchase and appraisal of the second quarter 2007 donation. The gallery owner applied this payment to the third quarter purchase and appraisal. The gallery owner sent a vessel to the MINGEI on behalf of the UCA that was appraised at $6,000 by the gallery owner.

36. In late October 2007, the UCA signed and returned the third quarter 2007 donation paperwork that he had been sent by the MINGEI. The UCA listed the value of the donated vessel as $6,000.

37. The appraisals prepared by the gallery owner:

    (a) had cover letters that accompanied the appraisals that falsely stated that they had been prepared by Roxanna Brown, the Curator of the Southeast Asian Museum of Bangkok University and falsely stated that Brown had personally inspected the appraised items;

(b) the appraisal included a copy of Brown's resume, establishing her expertise;

(c) purported to be based on a market comparison approach to valuation, they failed to disclose the actual prices that the UCA had paid for the items, or that the UCA had purchased the items from the smuggler and the gallery owner; and

(d) Referred to the smuggler's business and the gallery owner's spouse as independent, disinterested third parties supporting the appraisal values.

38.    In December 2007, the gallery owner advised the UCA that:

(a) he was doing seven or eight appraisals and donations of Ban Chiang antiquities for himself, his relatives and the UCA for the fourth quarter of 2007.

(b) all of the donations went to the Mingei, where they were accepted by the staff.

39. On or about January 8, 2008, the UCA received donation paperwork from the MINGEI for the fourth quarter 2007 donation. The paperwork listed two Ban Chiang ceramic vessels as being donated by the UCA to the museum.  The two vessels were valued on the paperwork at $4,950.

**B. OBSERVATIONS BY THE UCA AT THE MINGEI**

40. During the visits the UCA has made to the MINGEI, he has seen the following:

17

(a) computers used by the museum curatorial staff for creating documents, a museum management database, and storing electronic copies of artifact pictures and documents;

(b) books on archaeology and archaeological resources;

(c) Thai ceramic vessels donated to the MINGEI by the UCA;

(d) Thai archeological resources identified by MINGEI staff as Thai;

(e) items the UCA, based on his knowledge and experience, believes to be Thai archeological resources; and

(f) paperwork documenting the donation and acceptance of antiquities.

**C. COMPUTER DATA**

41. Based on my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

(a) Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.

18

There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched;

(b) searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

(c) the volume of data stored on many computer systems and storage devices will typically be so large that it will be highly

19

impractical to search for data during the execution of the
physical search of the premises.  A single megabyte of storage
space is the equivalent of 500 double-spaced pages of text.  A
single gigabyte of storage space, or 1,000 megabytes, is the
equivalent of 500,000 double-spaced pages of text.  Storage
devices capable of storing 160 gigabytes (GB) of data are now
commonplace in desktop computers.  Consequently, each non-
networked, desktop computer found during a search can easily
contain the equivalent of 80 million pages of data, which, if
printed out, would completely fill a 35' x 35' x 10' room to the
ceiling.  Further, a 160 GB drive could contain as many as
approximately 150 full run movies or 150,000 songs; and

(d) computer users can attempt to conceal data within
computer equipment and storage devices through a number of
methods, including the use of innocuous or misleading filenames
and extensions.  For example, files with the extension ".jpg"
often are image files; however, a user can easily change the
extension to ".txt" to conceal the image and make it appear that
the file contains text.  Computer users can also attempt to
conceal data by using encryption, which means that a password or

device, such as a "dongle" or "keycard," is necessary to decrypt
the data into readable form.    In addition, computer users can
conceal data within another seemingly unrelated and innocuous
file in a process called "steganography." For example, by using
steganography a computer user can conceal text in an image file
which cannot be viewed when the image file is opened.    Therefore,
a substantial amount of time is necessary to extract and sort
through data that is concealed or encrypted to determine whether
it is evidence, contraband or instrumentalities of a crime.

## IV. CONCLUSION

42. Based on the facts stated above and my experience and
training, I believe there is probable cause to support the
issuance of a search warrant for the MINGEI including exhibition
galleries, offices and curatorial facilities located at 1439 El
Prado, San Diego, California 92101 and the computers at that
location ("the premises"). I also believe that there is probable
cause to believe that these premises, as further described in
Attachment A, contain evidence, as described in Attachment B, of
violations of California Penal Code sections 31, 497, thus, in
contravention of Archaeological Resources Protection Act, 16
U.S.C. sections 470ee(c),(d), and 18 U.S.C. section 371 and 26

U.S.C. section 7206(2), conspiracy to aid and assist in the preparation of false tax returns.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of January 2008 at San Diego, California.

Bonny MacKenzie

BONNY MACKENZIE
Special Agent, IRS - CI


Subscribed and sworn to before me this ___17a___ day of January 2008.


UNITED STATES MAGISTRATE JUDGE

22

ATTACHMENT A

PREMISES TO BE SEARCHED

The Mingei International Inc., which operates the Mingei
International Museum, is located at 1439 El Prado in San Diego,
California.  This location is within Balboa Park and within the
House of Charm building.  The building is Mission style.  It is
beige in color and appears to resemble stone.  The front of the
building has colonnade like features on either side of the main
door, which extend to the second floor.  The roof line has two
bell towers, one above each colonnade.  The main entrance is from
the parking lot through an arch near a colorful statue.  A green
sign with beige hangs in the arch and lists "Mingei International
Museum". The main entrance is past the arch and is a squared
doorway with the word "Mingei" listed in red letters on a
metallic background above the doorway.  The door is a glass
double doors with brown wood like trim.  A covered corridor runs
parallel to the front and right side of the building.  In the
corridor above the main entrance is a green sign with beige
writing listing Mingei International Museum with an arrow
pointing to the main entrance. The areas to be searched do not
include the gift shop.

23

ATTACHMENT B

ITEMS TO BE SEIZED

Based on the foregoing, I respectfully submit that there is
probable cause to seize the following items which constitute
evidence of violations of California Penal Code sections 31, 497,
thus in contravention of the ARPA, 16 U.S.C. sections
470ee(c),(d), and 18 U.S.C. section 371 and 26 U.S.C. section
7206(2), conspiracy to aid and assist in the preparation of false
tax returns:

(a) Any item donated by the UCA to the museum that is
identified on the inventory attached as Exhibit A;

(b) Any archeological resource identified as being from
Thailand;

(c) Photographs of archaeological resources from Thailand;

(d) Books and other materials containing information on
archaeological resources from Thailand;

(e) Records from 1998 to the present pertaining to the
acquisition (including exportation and importation), purchase,
sale, disposition or donation (including disposition of donated
material) of archeological resources from Thailand, including
appraisals and Internal Revenue Service forms and records
relating to donations or disposition of donated material;

24

(f) Records from 1998 to present pertaining to the receipt, transfer and expenditure of income received from the sale of archaeological resources exported from Thailand;

(g) As used above, the term "records" includes documents, programs, applications or materials created, modified or stored in any form; and

(h) in searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices;

ii. If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein;

iii. If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer personnel will determine whether it is practical to copy the data contained on the computer devices during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the computer devices cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a copy of the data contained on each computer device (a "data image") during the execution of this search and shall seize the data images rather than the computer devices themselves;

iv. If the computer personnel determine it is not practical to perform an on-site search of the computer devices or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein;

v. In searching the computer devices or data images, the computer personnel may examine all of the data contained in

26

the computer devices or data images to view their precise

contents and determine whether the data falls within the items to

be seized as set forth herein.  In addition, the computer

personnel may search for and attempt to recover "deleted,"

"hidden" or encrypted data to determine whether the data falls

within the list of items to be seized as set forth herein; and

vi. if the computer personnel seize the computer

devices pursuant to subparagraph iv above or make a data image

pursuant to subparagraph iii above, the computer personnel will

search the computer devices or data images within a reasonable

amount of time not to exceed 60 days from the date of execution

of the warrant.  If, after conducting such a search, the case

agents determine that a computer device or data image contains

any data falling within the list of items to be seized pursuant

to this warrant, the government will retain the computer device

or data image; otherwise, the government will return the computer

device or delete the data image.  If the government needs

additional time to determine whether the data on the computer

devices or data images falls within any of the items to be seized

pursuant to this warrant, it may seek an extension of the time

period from the Court within the original sixty day period from

the date of execution of the warrant.

(i) Except for the items listed in paragraph (a) above, a

substantial amount of time maybe necessary to determine whether

27

an object is evidence of the crimes listed in this warrant.  An
analysis of the records, including those stored on a museum
computer, and the items listed in paragraphs (b) through (f)
above and/or an examination by an antiquities expert to determine
the origin, age, and authenticity of an object will likely be
necessary.

It would be highly impractical to do this analysis during
the execution of the physical search of the museum.

There is also risk of damaging archaeological resources in
transporting them to an evidence storage locker.

Based on these factors, law enforcement personnel executing
this search warrant will employ the following procedure:

i. Upon entering and securing the premises, the
government will temporarily "seize in place" those archeological
resources that the UCA or an expert in the field of Ban Chiang
antiquities believes to be evidence of the crimes listed in the
warrant.  The museum shall:

(a) allow government agents and experts access to
the "seized" archeological resources during the normal business
hours of the museum and at another mutually agreed upon time to
photograph, document and examine the resources;

(b) allow the government to remove from the museum
any "seized" archeological resource that an expert believes

should it be necessary for the gov't to _Not_ "seize in place,"
the government will retain the services of a professional company
to pack and transport seized items to industry
standards; and the items will then be maintained
and stored according to the same standards.

requires additional examination at another location to determine origin, age and authenticity; and

(c) not access, touch, move, loan, sell, damage, destroy or otherwise dispose of the "seized" archeological resource without first receiving approval from the Court or the government.

ii. The government will have 90 days to determine if the temporarily "seized" archeological resources are evidence of violations listed in the search warrant. The time frame of 90 days is necessary because it may take up to 60 days to get any computer data copied and analyzed, and there are a limited number of experts available to examine the "seized" objects;

iii. At the end of 90 days from the date of the start of the execution of this warrant any archeological resource that was temporarily "seized" but is not evidence of a crime listed in the warrant will be returned to the museum; and

iv. If the government needs additional time to determine whether the temporarily "seized" archeological resources are evidence of the crimes listed in the warrant, the government may seek an extension from the Court of the initial 90 day time period.

29

ATTACHMENT C



Above:  Front view of the main entrance to the museum.



Above:  Close up of the main entrance to the museum.

MINGEI INTERNATIONAL MUSEUM
Exhibit A

**2nd Quarter 2006 Donation**

| Museum Accession # | Description |
| --- | --- |
| 2006-41-01 | Ban Chiang Basket Impressed Vessel |
| 2006-41-02 | Ban Chiang Rope Impressed Vessel |
| 2006-41-03 | Ban Chiang Offering Dish |
| 2006-41-04 | Khmer Bottle |
| 2006-41-05 | Khmer Vessel |
| 2006-41-06 | Ban Chiang Pedestal Bowl |
| 2006-41-07 | Ban Chiang Vessel |

**3rd Quarter 2006 Donation**

| Museum Accession # | Description |
| --- | --- |
| 2006-57-01 | Ban Chiang Vessel |

**1st Quarter 2007 Donation**

| Museum Accession # | Description |
| --- | --- |
| 2007-16-01 | Ban Chiang Double Flanged Bracelet |
| 2007-16-02A-H | Ban Chiang Spindle Whorls |
| 2007-16-03 | Ban Chiang Pottery Anvil |
| 2007-16-04 | Ban Chiang Pottery Anvil |
| 2007-16-05 | Ban Chiang Pottery Roller |
| 2007-16-06 | Ban Chiang Pottery Roller |
| 2007-16-07 | Ban Chiang Adze |
| 2007-16-08 | Ban Chiang Adze w/ Textile |
| 2007-16-09A-B | Ban Chiang Serpentine Bracelets |
| 2007-16-10 | Ban Chiang Serpentine Bracelet |

**3rd Quarter 2007 Donation**

| Museum Accession # | Description |
| --- | --- |
| 2007-? | Ban Chiang Vessel with Red Design |

**4th Quarter 2007 Donation**

| Museum Accession # | Description |
| --- | --- |
| 2007-16-21 | Ban Chiang Globular Jar with Tall Pedestal |
| 2007-16-22 | Ban Chiang Globular Jar with Pedestal |